**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION**

JAMONE WILLIAMS,

      Plaintiff,

      v.

QUALITY CORRECTIONAL CARE, LLC,
NURSE TESSA LEHMAN, NURSE
JEANIE HERMAN, NURSE JACQUELINE
RYAN, NURSE KELLY STUDEBAKER,
NURSE JANICE GILBERT, MIKHAIL
GALPERIN MD, and ALLEN COUNTY
SHERIFF TROY HERSHBERGER,

      Defendants.

CAUSE NO.: 1:24-CV-58-TLS

**OPINION AND ORDER**

This case arises out of incidents related to Plaintiff Jamone Williams' medical treatment for type I diabetes that took place at the Allen County Jail from February 18, 2022, through February 28, 2022. On February 28, 2022, the Plaintiff was transferred from the Allen County Jail to Parkview Hospital where he was admitted until April 25, 2022, and treated for sepsis, MRSA, leukocytosis, endocarditis, acute kidney injury, pneumonia, cellulitis, osteomyelitis, and a torn esophagus. While hospitalized, the Plaintiff lost vision in his left eye and his left leg was amputated below the knee. In his Amended Complaint [ECF No. 27], the Plaintiff brings (1) an Eighth Amendment claim for deliberate indifference to his serious medical needs against Defendants Quality Correctional Care, LLC, (QCC), Nurse Tessa Lehman, Nurse Jeanie Herman, Nurse Jacqueline Ryan, Nurse Kelly Studebaker, Nurse Janie Gilbert, and Mikhail Galperin MD (Dr. Galperin) (collectively, Medical Defendants); (2) a *Monell* claim against Defendant Allen County Sheriff Troy Hershberger in his official capacity based on an underlying

Eighth Amendment violation for unconstitutional conditions of confinement at the Allen County Jail; and (3) a medical malpractice claim under Indiana state law against the Medical Defendants.

This matter is now before the Court on: (1) the Plaintiff's Motion for Partial Summary Judgment as to Liability [ECF No. 46], filed on April 28, 2025; (2) the Medical Defendants' Motion for Summary Judgment [ECF No. 49], filed on April 28, 2025; and (3) the Medical Defendants' Motion to File Belated Brief, Statement of Undisputed Facts, and Designation of Evidence in Support of Motion for Summary Judgment [ECF No. 52], filed on April 30, 2025. These are briefed and ripe for ruling.

### MEDICAL DEFENDANTS' MOTION FOR EXTENSION OF TIME

The Medical Defendants seek a two-day extension of time to file their brief, statement of material facts, and evidence in support of their timely filed motion summary judgment. "[I]f a filing deadline passes, Federal Rule of Civil Procedure 6(b) provides that district courts may, for good cause, grant a post-hoc motion for leave to file if the moving party 'failed to act because of excusable neglect.'" *Christensen v. Weiss*, 145 F.4th 743, 755 (7th Cir. 2025) (quoting Fed. R. Civ. P. 6(b)(1)(B)); *see* Fed. R. Civ. P. 6(b)(1)(B) ("When an act may or must be done within a specified time, the court may, for good cause, extend the time . . . on motion made after the time has expired if the party failed to act because of excusable neglect."). To determine whether the Medical Defendants' stated reason qualifies as "excusable neglect," the Court must consider: "[1] the danger of prejudice to the [the Plaintiff], [2] the length of delay and its potential impact on judicial proceedings, [3] the reason for the delay, including whether it was within the reasonable control of the movant, and [4] whether the movant acted in good faith." *Christensen*, 145 F.4th at 755 (quoting *Pioneer Inv. Servs. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993)).

In this case, the Medical Defendants' dispositive motion deadline was April 28, 2025. Although their Motion for Summary Judgment was filed by the deadline, they did not file the brief in support of the motion because their attorney had inadvertently saved over the file. Once counsel learned of the error, on April 28, 2025, he immediately notified counsel of record by email of the issue and the intent to file a belated brief. The Medical Defendants report that no counsel of record expressed any concerns or objections, to which the Plaintiff's counsel clarifies that she did not respond to the email of the Medical Defendants' counsel.

On April 30, 2025, the Medical Defendants filed a Motion to File Belated Brief, Statement of Undisputed Facts, and Designation of Evidence in Support of Motion for Summary Judgment [ECF No. 52] requesting leave to file the belated brief up to and including April 30, 2025, and contemporaneously filed each document [ECF Nos. 50, 51, 53]. The Plaintiff filed a response [ECF No. 54] on May 1, 2025, contending that the extension should be denied because the Medical Defendants' counsel has not shown excusable neglect because he has not complied with discovery deadlines and has only shown inadvertence or plain neglect. The Plaintiff argues that the Medical Defendants filed evidence that had never been produced in discovery, even though it was requested.

The Court finds the Plaintiff's argument unavailing because the Plaintiff has not identified danger of prejudice as the Medical Defendants only attached the Plaintiff's medical record from the Allen County Jail, which the Plaintiff also attached to his Motion for Partial Summary Judgment, and an affidavit from Dr. Galperin. To the issue of any outstanding discovery requests, the procedure for the Plaintiff to follow would have been to file a motion to compel, which the Plaintiff did not do. *See* Fed. R. Civ. P. 37(a). The extension request is only for two days, which does not delay this litigation. The reason for the delay is that the Medical Defendants' counsel inadvertently saved over the file with the summary judgment brief and then

3

notified counsel of record on the April 28, 2025 deadline. The Court finds no indication that the Medical Defendants' counsel did not act in good faith.

Therefore, the Court finds good cause and excusable neglect for the Medical Defendants missing the April 28, 2025 filing deadline and grants the two-day extension requested in the Medical Defendants' Motion to File Belated Brief, Statement of Undisputed Facts, and Designation of Evidence in Support of Motion for Summary Judgment.

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant may discharge this burden by "either: (1) showing that there is an absence of evidence supporting an essential element of the non-moving party's claim; or (2) presenting affirmative evidence that negates an essential element of the non-moving party's claim." *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016) (citation omitted). In response, the non-movant "must make a sufficient showing on every element of his case on which he bears the burden of proof; if he fails to do so, there is no issue for trial." *Yeatts v. Zimmer Biomet Holdings, Inc.*, 940 F.3d 354, 358 (7th Cir. 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). In ruling on a motion for summary judgment, a court must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Id.* (citation omitted).

With cross-motions for summary judgment, a court must construe all facts in a light most favorable to the party against whom the motion under consideration is made. *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017). A court's role "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material

4

dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citations omitted).

## BACKGROUND AND MATERIAL FACTS[1]

From February 2020 through February 2022, the Plaintiff was a prisoner at the Allen County Jail. ECF No. 46-1, ¶ 2. The Plaintiff stated, "While I was incarcerated at the Allen County Jail, I suffered from Type 1 Diabetes." *Id.*, ¶ 3. He was "housed with two other individuals in a cell that was designed to house only two people." *Id.*, ¶ 4. And his "cell, the dayroom, and the showers were unclean," and his "feet were constantly exposed to unsanitary conditions." *Id.* ¶¶ 5, 6. "Medical staff never provided [him] with diabetic footwear." *Id.* ¶ 7. "The footwear that [he] was provided by the Allen County Sheriff had already been used by previous inmates." *Id.* ¶ 8.

Also, "[d]ue to a burst pipe, [his] cell was flooded with wastewater from the toilet." *Id.* ¶ 9. This occurred "sometime between January 6, 2022 and January 31, 2022." ECF No. 64-1, ¶ 6. Plus, at the Allen County Jail, "[t]he shower drains would also overflow with wastewater" and "constantly back[] up with sewer water." *Id.* ¶ 7; ECF No. 46-1, ¶ 10. "The cleaning supplies available to [the Plaintiff] . . . consisted of a dirty mop, dirty mop bucket, disinfectant ball, and brooms." ECF No. 64-1, ¶ 4. However, "[s]ome of the guards at the Allen County Jail did not allow cleaning." *Id.* ¶ 5.

At all times relevant, Defendant Dr. Galperin was a licensed medical doctor employed by QCC and assigned to the Allen County Jail. ECF No. 51-7, ¶ 2. He was authorized to perform all duties within the scope of his license including patient evaluations and prescribing medication. *Id.*, ¶ 3.

---

[1] The Court disregards substantive arguments and characterization of evidence in the fact statements and considers the facts only as supported by the cited evidence of record. The Court also provides additional facts from some of the cited exhibits to provide additional context.

At all relevant times, Defendant Gilbert was also employed by QCC and assigned to the Allen County Jail as a Medically Trained Personnel under Dr. Galperin's supervision. *Id.*, ¶ 6. She was not a nurse and performed no nursing duties. *Id.*, ¶ 7.

At all times relevant, Defendants Lehman, Herman, and Studebaker were Licensed Practical Nurses employed by QCC and assigned to the Allen County Jail under Dr. Galperin's supervision. *Id.*, ¶¶ 13, 18, 23. They were authorized to perform nursing duties within the scope of their license including patient evaluations. *Id.*, ¶¶ 14, 19, 24.

At all times relevant, Defendant Ryan was a Registered Nurse employed by QCC and assigned to the Allen County Jail under Dr. Galperin's supervision. *Id.*, ¶ 28. She was authorized to perform nursing duties within the scope of her license including patient evaluations. *Id.*, ¶ 29.

Dr. Galperin conducted chronic care follow-up visits with the Plaintiff at the Allen County Jail on December 3, 2020, April 5, 2021, and August 2, 2021, noting A1C levels and Degree of Control as: 9.9 and "Fair," 9.4 (down from 9.9) and "Good," and 9.9 and "Fair," respectively. ECF No. 46-3, pp. 29, 31, 34 of 54. As to the Plaintiff's historical A1C levels, correctional medicine physician medical expert Dr. Ryan Herrington stated that they "indicate that [the Plaintiff's] diabetes was poorly controlled," which "Parkview Hospital medical practitioners took note of and documented . . . at the time of his hospital admission." ECF No. 46-2, p. 28 of 38. Also, looking at data on the Plaintiff's blood sugar levels from 2020 through 2022, Dr. Herrington commented that "[the Plaintiff] was frequently and routinely hypoglycemic (low blood sugar level) at ACJ [(Allen County Jail)] . . . ." *Id.*, p. 29 of 38.

About the Plaintiff's A1C levels, the Plaintiff's second medical expert, an endocrinologist specializing in diabetes, Dr. Philip Levin opined:

> [The Plaintiff's] diabetes control showed high glucose levels as evidenced by A1C levels of 9.9 on December 3, 2020, 9.4 on April 5, 2021, 9.9 on August 2, 2021, and 10 on January 13, 2022 with glucose of 207 at the time of admission. With glucose this high, there should have been even more urgency to have podiatry or

[an] endocrinologist evaluate his foot, as the chance of serious infection was increased. In fact, these are dangerous levels that subjected him to an elevated risk of infection. [The Plaintiff] should have been carefully monitored and he was not. He should have been placed on antibiotics much earlier and he was not.

ECF No. 59-7, ¶ 17; ECF No. 46-6, ¶ 4.

On October 6, 2021, Defendant Ryan noted that "[the Plaintiff's] blood sugars have been on the higher side." ECF No. 46-3, p. 24 of 54.

Defendant Ryan then noted, on November 14, 2021, that:

[the Plaintiff's] bottom of left foot that had order for Vaseline due to cracking from dry skin that started bleeding has open area that is non healing, [he] is type 1 diabetic. Area does not appear infected. Okay to do TAO and gauze and dc vaseline until seen by Dr. Galperin on Monday? Will update MD on call.

*Id.*, p. 51 of 54.

As for foot complications, Dr. Herrington wrote in his report that "[the Plaintiff] was at high risk . . . because of history of neuropathy. Diabetic related foot complications appear in [the Plaintiff's] ACJ medical records as early as May 2020." ECF No. 46-2, p. 26 of 38. In support, Dr. Herrington pointed to a record of an appointment set by non-party Melanie Ferrer stating "LWC to R pinky toe x3 days *extend past 05/09/2020 if needed*." *Id.*; *see* ECF No. 46-3, p. 10 of 54.

On January 12, 2022, the Plaintiff had cataract surgery with Dr. Purdy outside of the Allen County Jail. ECF No. 46-3, p. 52 of 54. The Plaintiff had related follow-up appointments on January 13, 2022, and February 4, 2022. *Id.*, pp. 52–53 of 54.

On February 19, 2022, non-party Sarinna Arick noted in the Plaintiff's Allen County Jail medical record that the Plaintiff "has been getting his Basaglar brought in by family" but his "[f]amily can no longer supply" it. ECF No. 46-3, p. 53 of 54. She also noted that the Plaintiff's orders were for "30U in the AM and 15U in the evening" and he "has enough of home supply for this evenings dose then will be out." *Id.* The record also indicates that, in response, non-party on-

call provider Kylie Henderson said, "Start N insulin 10units bid tomorrow[.] Can increase in a few days if needed." *Id.* Arick added, "We don't have N, we have 70/30," to which Henderson said, "That's fine, 70/30 10 U BID." *Id.*

On February 21, 2022, Defendant Herman noted in the Plaintiff's medical record that his "family brought in lantus for [him]. Dr. [G]alperin notified and new order received to discontinue 70/30 and restart Lan[tus] orders." *Id.* She also noted, "Hunger strike, vitals. [The Plaintiff] states he hasn't ate in 2 days due to not getting his lantus." *Id.*, pp. 37, 41, 46 of 54. And the Plaintiff's wife, Michele Williams, states that, on February 21, 2022, she "asked Nurse Herman why the incorrect insulin had been given to [the Plaintiff] when [she] had notified them [she] was bringing the correct insulin to the jail." ECF No. 46-4, ¶ 9. She also states, "Nurse Herman told [her] that medical does not run on [Mrs. Williams'] schedule." *Id.*, ¶ 10. The Plaintiff states, "Starting on or around February 21, 2022, I was unable to walk to the medical station due to the condition of my foot." ECF No. 59-9, ¶ 4. He also states, "Since I had no crutches or a wheelchair, I was unable to go to the medical station for my insulin and blood sugar checks." *Id.*, ¶ 5. Dr. Herrington opined that "[i]t is not a proper operational practice to refuse medical treatment, to refuse to permit a patient to attend the medical appointments, and to not provide a wheelchair so that a patient could attend medical appointments." ECF No. 59-8, ¶ 9.

About the Plaintiff's insulin regime at the Allen County Jail, Dr. Herrington stated, "[The Plaintiff's] ACJ chart references insulin switching which is not consistent with conventional medical practice." ECF No. 46-2, p. 27 of 38. And, to show an example of "insulin switching" in his report, Dr. Herrington included the following from the Plaintiff's medical record on February 21, 2022:

| 02-21-2022 6:12 pm | Pt family brought in lantus for pt. Dr galperin notified and new order received to discontinue 70/30 and restart Lanuts orders | Herman, Jeanie | Medical Staff | Medical Note |
|---|---|---|---|---|

*Id.*

Relatedly, Dr. Herrington also said that "Insulin Lispro (Humalog) orders (example below) in [the Plaintiff's] ACJ medical chart do not conform to conventional prescribing requirements because an actual number of administered insulin units is not specified." ECF No. 46-2, p. 26 of 38, ¶¶ 20–22. He included the portion of the Plaintiff's medical chart (from February 24, 2020), which indicates that non-party Dr. Lee prescribed a dose strength of 100 unit/ml of insulin and approved the Plaintiff "for home supply." *Id.*, p. 27 of 38. Dr. Herrington contends that instead the number of units of insulin that should be administered should be documented as follows:

**insulin lispro** 100 unit/ml injection Common Name· HumaLOG
Inject 0.15 mls (15 Units total) into the skin 3 (three) times daily before meals. Max Daily Dose: 45 Units
Ordered by Lawrence Harvey, MD
Refills: O
Last dose given- 8 Units on April 25, 2022 9:57 AM

*Id.*

On February 24, 2022, the Plaintiff's medical record indicates that he presented to Dr. Galperin "to talk about his insulin" and because he "provides [his] own Lantus as he says 70/30 is no good for him." ECF No. 46-3, p. 25 of 54. The Plaintiff reported "that lately he's been sweating, [and] unable to hold any food down." *Id.* He also reported "small wounds on his left leg and it is swollen more than the right one." *Id.* At the clinic visit, Dr. Galperin performed a visual exam of the Plaintiff's left foot noting that the Plaintiff reported "a small wound on his left leg and it is swollen more than the right one," "sweating," and "unable to hold food down" finding that the "[w]ounds look much better," no signs or symptoms of infection, and mild non-pitting edema in the left foot. *Id.* The Plaintiff states, "Dr. Galperin told me that my left foot was swollen due to water retention and that it would go away." ECF No. 46-1, ¶ 17. The medical

9

record also indicates that Dr. Galperin prescribed Clindamycin, Tylenol, and Zofran. ECF No.

46-3, p. 25 of 54. Clindamycin is an antibiotic. ECF No. 46-2, p. 34 of 38.

As to this clinical encounter between Dr. Galperin and the Plaintiff, Dr. Herrington

opined:

> [The Plaintiff] was seen at approximately 10:00AM on 02/24/22 by Dr. Galperin who noted an inability to "keep things down" as well as left lower extremity swelling. Dr. Galperin prescribed [the Plaintiff] an antibiotic (clindamycin). Dr. Galperin did not document or reference [the Plaintiff's] abnormally elevated heart rate of 112 beats per minute or his low grade fever of 100.2 °F. Given [the Plaintiff's] "inability to keep things down" in the context of uncontrolled diabetes and abnormal vital signs that are consistent with early sepsis, standard of care required a prompt referral to the local hospital. Because Dr. Galperin instead chose to keep [the Plaintiff] at ACJ, failed to use an infirmary (or the equivalent of an infirmary) for monitoring purposes and additionally failed to order immediate/STAT bloodwork (specifically a complete blood count), Dr. Galperin breached standard of care. As the result, [the Plaintiff] was put in a position of unreasonable risk.

*Id*.

On February 25, 2022, Defendant Ryan noted in the Plaintiff's medical record that he

"reported that he had blood in his vomit" and "that he thinks his infection was getting worse and

may need to go to the hospital." ECF No. 46-3, p. 53 of 54. Defendant Ryan also noted that she

told the Plaintiff to "save [the vomit] so [she] can check it." *Id*. She added, "Officer brought a

cup with yellow vomit, no visible blood noted but when dipped showed 3+. Will attach MD sick

call from this week and update MD." *Id*.

As to the vomiting, the Plaintiff's medical expert Dr. Herrington expressed:

> On 02/25/22, Dr. Galperin was notified that [the Plaintiff] had additional vomiting that tested positive for blood. Because of [the Plaintiff's] continued vomiting in the context of diabetes and now the possibility of a gastrointestinal bleeding, standard of care required a referral to the local hospital. Because Dr. Galperin failed to refer [the Plaintiff] to the hospital, standard of care was not met and [the Plaintiff] was left again in a position of unreasonable risk.

ECF No. 46-2, p. 35 of 38. However, when the Plaintiff was later admitted to Parkview Hospital,

he was evaluated by non-party gastroenterologist Dr. Martha Vergara, who noted that "[the

Plaintiff] noticed small amount of blood in his vomitus [a]fer retching several times" but "[n]o vomiting since admission" and "[n]o melena [black stool from gastrointestinal bleeding]" and determined it is "[m]ost probably esophagitis" and that there is "[n]o evidence of significant G.I. bleeding since no melena." ECF No. 46-5, p. 58 of 78. The Plaintiff was diagnosed with "Mallory Weiss tear, esophagitis, gastritis" with the explanation that "[h]is episode of hematemesis [vomiting blood] was likely a 2/2 Mallory Weiss tear given his vomiting with retching, which is self limiting and therefore no endoscopic intervention is warranted . . . ." *Id.*, p. 59 of 78.

On February 26, 2022, Nurse Ryan noted that "[the Plaintiff] is requesting crutches until his foot gets better" because his foot "is painful when he bears any weight on it." ECF No. 46-3, p. 53 of 54. The Plaintiff also said that on the same date, "I was told that in order to get my insulin I need to walk to medical or I would go without my insulin," and "I told medical staff that I could not walk to medical due to the pain." ECF No. 46-1, ¶¶ 23–24.

The Plaintiff's second medical expert Dr. Philip Levin opined:

> After [the Plaintiff] complained about the swelling and pain in his left foot in February 2022, the standard of care required that Dr. Galperin and other Quality Correctional Care employees provide him with immediate advanced medical care, including the referral to a podiatrist or endocrinologist to assist with [the Plaintiff's] type 1 diabetes.

EFC No. 46-6, ¶ 10. Dr. Levin also opined:

> Especially after he complained of swelling and pain in his left foot, he needed immediate advanced medical care. If a podiatrist or endocrinologist was not available, then the jail should have transported him to the nearest hospital for treatment. The delay in seeking treatment for his left foot infected ulcer let to his developing sepsis, osteomyelitis, and left foot amputation BKA.

*Id.*, pp. 26, 37 of 38. This is because "[i]t is known that infections spread quickly in diabetics." *Id.*, ¶ 11.

11

Also, for February 26, 2022, the Plaintiff's medical expert Dr. Herrington opined as to non-party Dr. Lee:

> Dr. Lee on 02/26/22 breached standard of care because he had the obligation to consider the events above from 02/24/22 and 02/25/22 and the opportunity to refer [the Plaintiff] to the hospital. Dr. Lee failed to refer [the Plaintiff] to the hospital and accordingly standard of care was not met.

ECF No. 46-2, p 35 of 38.

As for the medical events involving the Plaintiff on February 24, 25, and 26, 2022, Dr. Herrington opined, "Based on a reasonable degree of medical certainty and on a more likely than not basis, [the Plaintiff's] referral to the hospital on 02/28/22 was irresponsibly delayed in an extreme departure from standard of care." *Id.*, p. 35 of 38. Dr. Herrington added that "it is unlikely by any reasonable criteria that these breaches took place in isolation outside of a knowing or informed context." *Id.*, p. 37 of 38.

The Plaintiff avers that, on February 27, 2022, "I asked a jail employee, Officer Alexander, to notify medical staff that I needed medical attention." ECF No. 46-1, ¶ 27. The Plaintiff also states, "When Officer Alexander returned to my cell, he told me that he advised Nurse Jeanie Lehman of my condition and need for medical attention but Nurse Lehman told him that she was too busy and that she would deal with me later." *Id.*, ¶ 28. The Plaintiff adds, "Officer Alexander told me that Nurse Lehman told him that she "didn't have time for [my] s***." *Id.*, ¶ 29. He also states that "[l]ater that same evening I told Officer Vance Pruden that I needed medical attention. When Officer Pruden returned, he told me that he advised Nurse Lehman that I was very sick but Nurse Lehman still refused to come to my cell." *Id.*, ¶¶ 30–31. Dr. Galperin listed the dates on which Defendant Lehman interacted with the Plaintiff, and she did not do so on February 27, 2022. Ex. 51-7, ¶ 16. For this same day, the Plaintiff's medical expert Dr. Levin said, "[A] nurse was advised of [his] left foot[']s worsening symptoms but did not call for medical specialist evaluation." ECF No. 46-6, pp. 25, 36 of 38.

12

On February 28, 2022, in the afternoon, "[the Plaintiff] report[ed] continued pain and swelling in the left [foot]," "unable to bear weight on left foot," and "nausea an[d] chills." ECF No. 46-3, p. 26 of 54. In response, Dr. Galperin added "Bactrim . . . to the existing clindamycin regime" and said, "Ok to use crutches." *Id.*, p. 26 of 54.

Also on that date, Defendant Ryan noted, "Per verbal order [from] Dr. Galperin, [the Plaintiff] may use stone that family provided." *Id.* The Plaintiff's medical expert Dr. Levin characterized the verbal order from Dr. Galperin as:

> Instead of seeking immediate advanced medical care as described above, Dr. Galperin and other Quality Correctional Care employees asked [the Plaintiff's] wife to bring a pumice stone and he and his infection were exposed to the elements of the dirty jail. In my opinion, this was a procedure that should have been done by a podiatrist, if at all. Thereafter, he should have been closely monitored and kept away from the dirty jail. If a procedure was performed by a podiatrist, there would have been follow up instructions if there was swelling or tenderness, he needs to be seen in the Emergency Room.

ECF No 46-6, ¶ 13. Dr. Levin also said, "The shaving of the sore on [the Plaintiff's] left foot worsened the infection." *Id.*, ¶ 14.

Later that evening, the Plaintiff reported to Defendant Ryan that he was vomiting blood, growing "weaker and weaker," and going into diabetic ketoacidosis for which Defendant Ryan noted that the Plaintiff "ha[d] a significant [history] of in the past." ECF No. 46-3, p. 53 of 54. As a result, Dr. Galperin decided to "send him out" to the hospital, Parkview, where the Plaintiff was first seen in the emergency room and admitted on March 1, 2022. *Id.*; *see* ECF No. 46-5, pp. 3, 9 of 78.

At the emergency room the Plaintiff's heart rate was 109, his temperature was 98.7ºF, and he said he had "[t]aken nothing prior to arrival [to] attempt to alleviate symptoms." ECF No. 46-5, pp. 3, 5 of 78. He had a physical exam with "no acute distress," was "[n]ontoxic appearing," had "some swelling and redness and warmth [] to the dorsum of the left midfoot," but "no open wound." *Id.*, pp. 5–6 of 78. "He ha[d] white blood cell count of 35000 with

13

bandemia" and "some acute kidney injury." *Id.*, p. 8 of 78. The provider "[did] not see obvious source of infection left foot is swollen warm" and indicated the Plaintiff "[w]ill be admitted with broad spectrum antibiotics." *Id*. And in the emergency room he was diagnosed with Bandemia and an acute kidney injury and treated with Vancomycin and Zosyn. *Id.*, pp. 9, 31 of 78.

On March 1, 2022, the Plaintiff was evaluated at Parkview by non-party Dr. Terence Anguh who noted that the Plaintiff had an ulcer on his left heel and would be treated with antibiotics Zyvox and Zosyn. *Id.*, pp. 31–33 of 78. On the same day, he was also evaluated by non-party Dr. Jonathan Lynch—who was asked to provide a consultation to evaluate the Plaintiff's left foot pain. *Id.*, p. 43 of 78. Dr. Lynch noted that the Plaintiff "[s]tates he's been able to control his sugars somewhat" and "[a]dmits to having a wound over the plantar aspect of the proximal position of his 5th metatarsal previously" which "has since calloused over." *Id*. Dr. Lynch also noted, "No obvious open wound or drainage on exam." *Id*.

On March 2, 2022, non-party Dr. Jason Baily evaluated the Plaintiff and noted, "Left lower extremity is not impressive for infection on exam 3/2/22. Leg is, however, edematous." *Id*. p. 75 of 78. He also noted, "On admission, WBC was 35.7 rising to 39.2." *Id.*, p. 68 of 78. Dr. Baily also said that the Plaintiff "[n]eeds TEE" and his primary team ordered an MRI. *Id*. p. 75 of 78. The MRI revealed, "Edema and enhancement along the plantar forefoot in proximity to the distal 4th and 5th metatarsal bones in keeping with cellulitis. No appreciable ulcer." *Id.*, p. 78 of 78. And although "TTE said possible vegetation [it] was ruled out by TEE." *Id.*, p. 36 of 78.

On March 3, 2022, the result of a blood culture showed that the Plaintiff was positive for a MRSA infection. *Id.*, pp. 1, 36 of 78.

On April 19, 2022, the Plaintiff's left leg was partially amputated below the knee. *Id.*, p. 38 of 78. The Plaintiff's hospital record states, "Patient is a poor candidate for foot salvage reconstruction options due to his poorly controlled diabetes and already microvascular disease.

14

Patient is also incarcerated which would limit his ability to obtain potential treatments for foot

salvage option including wound VAC therapy, recurrent debridements, IV antibiotics." ECF No.

46-2, p. 36 of 38.

The Plaintiff was discharged from Parkview on April 25, 2022. ECF No. 46-5, p. 36 of

78.

The Plaintiff's medical expert Dr. Herrington opined:

Based on a reasonable degree of medical certainty and probability, QCC and Dr. Galperin as an agent of QCC did not manage Mr. Williams' diabetes in a manner meeting standard of care because the clinical care provided was, as indicated above, irresponsibly poor, unlikely to be effective and markedly infrequent.

ECF No. 46-2, p. 33 of 38.

The Plaintiff's second medical expert Dr. Levin opined:

Once the patient had the symptoms of the sore foot and swelling, he needed the immediate attention of a podiatrist, an endocrinologist, or the hospital. If he had immediate care, there is a high probability the amputation could have prevented. Even transfer to the hospital 4-5 days earlier in February 2022 may have altered the course of the amputation, because he could have received IV antibiotics and this would have likely altered the course of the amputation.

ECF No. 46-6, ¶ 15. He also said, "The delay in sending [the Plaintiff] to the hospital to treat his

left foot resulted in [the Plaintiff's] developing sepsis, osteomyelitis, and the amputation of his

left foot below the knee." *Id.*, ¶ 16.

Dr. Levin further explained:

By February 26, 2022 the foot was also painful. The jail staff told Mr. Williams['] wife to bring in a pumice stone to shave down the foot lesion that had developed on the sole of his foot. By February 27, a nurse was advised of [his] left foot[']s worsening symptoms but did not call for a specialist evaluation. He was told by jail staff that his swollen foot was due to fluid retention. By February 28 the patient was finally transferred to Parkton Hospital for admission. By that time he had sepsis, mrsa, cellulitis, osteomyelitis and highly elevated wbc. During this hospitalization the patient had his left leg amputated BKA due to his osteomyelitis infection that had spread from his sore on his left foot.

*Id.*, p. 25.

He concluded:

> Numerous medical errors were made in the management of [the Plaintiff's] Type I diabetes while he was incarcerated in Allen county jail. A severe error was made in the handling of his left foot sore in February 2022. After he complained of swelling and pain in his left foot sore, the jail staff told his wife to bring in a pumice stone to shave down the sore. They did not get medical specialists to further evaluate the lesion. This was a serious error in that the shaving of the sore worsened the infection by opening it to the unsanitary conditions at the jail. This accelerated the foot infection, which should have been evaluated by medical specialists as soon as the medical staff was notified of his foot swelling. They should have brought in a podiatrist or endocrinologist to assist in his type I diabetes management, to prevent complications from developing.

*Id.*, pp. 25–26, 36–37 of 38.

> Dr. Levin also said:

> Especially after he complained of swelling and pain in his foot, he needed immediate advanced medical care. If a podiatrist or endocrinologist was not available, then the jail should have transported him to the nearest hospital for treatment. The delay in seeking treatment for his left foot infected ulcer [led] to his developing sepsis, osteomyelitis, and left foot amputation BKA.

*Id.*, pp. 26, 37 of 38.

Almost two years later, on February 8, 2024, the Plaintiff filed his Complaint for Violation of Civil Rights [ECF No. 1] in this Court. On March 28, 2024, the Plaintiff filed the operative Amended Complaint for Violation of Civil Rights [ECF No. 27], alleging a § 1983 Eighth Amendment claim against the Medical Defendants for deliberate indifference to his serious medical needs based on events that occurred from February 18, 2022, to February 28, 2022 (Count I); a § 1983 *Monell* claim against Defendant Sheriff Hershberger in his official capacity based on an underlying Eighth Amendment violation for unconstitutional conditions of confinement (Count II); and an Indiana state law claim of medical malpractice against the Medical Defendants (Count III).

**SUMMARY JUDGMENT ANALYSES**

The Plaintiff moves for summary judgment on his claims against the Medical Defendants for an Eighth Amendment violation based on purported deliberate indifference to his medical care (Count I) and for medical malpractice under Indiana state law (Count III), and against Defendant Sheriff Hershberger in his official capacity on his *Monell* claim based on an underlying Eighth Amendment violation for conditions of confinement at the Allen County Jail (Count II). The Medical Defendants move for summary judgment on the claims against them based on an Eighth Amendment violation for their purported deliberate indifference to the Plaintiff's medical needs (Count I) and for medical malpractice under Indiana state law (Count III). The Court addresses each motion in turn.

**A.    Plaintiff's Motion for Summary Judgment**

*1.    Applicable Constitutional Standard: Eighth Amendment*

Section 1983 provides, in pertinent part, that "[e]very person who, under color of [state law], subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law." 42 U.S.C. § 1983. To prevail on a § 1983 claim, a plaintiff must show that the defendant deprived him of a federal constitutional right and that the defendant acted under color of state law. *Savory v. Lyons*, 469 F.3d 667, 670 (7th Cir. 2006).

Here, the Amended Complaint brings federal claims under the Eighth Amendment for deliberate indifference to the Plaintiff's serious medical needs against the Medical Defendants and for unconstitutional conditions of confinement against Defendant Hershberger and, in the summary judgment briefing, the parties presume that the Eighth Amendment provides the proper standard for evaluating the claims. In this case, the Plaintiff was at the Allen County Jail from February 2020 through February 2022 as a pretrial detainee and a detainee during his trial and

17

while awaiting sentencing, which occurred on April 18, 2022, and was amended on June 17, 2024. *See State of Indiana v. Williams*, Case No. 02D05-2002-F4-000018. However, the Eighth Amendment is not applicable to presentencing detainees. *See Lewis v. Downey*, 581 F.3d 467, 474 (7th Cir. 2009). "Absent Eighth Amendment protections, his status would be analogous to that of a pretrial detainee, meaning that the basis for his § 1983 action should have been the Fourteenth Amendment Due Process Clause." *Id*.

"In *Miranda v. County of Lake*, [the Seventh Circuit] held the standard for pretrial detainees challenging their medical care under the Fourteenth Amendment is lower than that for post-conviction prisoners proceeding under the Eighth Amendment." *Stockton v. Milwaukee County*, 44 F.4th 605, 614 n.3 (7th Cir. 2022) (citing *Miranda v. County of Lake*, 900 F.3d 335, 350–54 (7th Cir. 2018)); *see Zemlick v. Burkhart*, 164 F.4th 1004, 1010 (7th Cir. 2026) ("[The Seventh Circuit] assess[es] pre-trial conditions of confinement under the Fourteenth Amendment's Due Process Clause." (citing *Miranda*, 900 F.3d at 350)). Here, however, the Plaintiff did not advocate for the application of the Fourteenth Amendment standard in any of his summary judgment briefs, "thereby waiving the question." *Stockton*, 44 F.4th at 614 n.3. Thus, the Court applies the Eighth Amendment standard on the cross motions for summary judgment.

2. *Eighth Amendment Claim Against the Medical Defendants for Deliberate Indifference to His Serious Medical Needs*

a.   Claim of Poor Diabetic Control from February 2020 through February 2022

For the first time in his Motion for Summary Judgment, couched in a preemptive statute of limitations argument, the Plaintiff presents a new theory of the Medical Defendants' liability for deliberate indifference to his serious medical needs based on poor diabetic control from February 2020 through February 2022. As highlighted by the Medical Defendants, this was not a factual basis for the Medical Defendants' deliberate indifference alleged in the original or

18

Amended Complaints. *See* Pl. Summ. J. Br. 11–13, ECF No. 47; Compl., ECF No. 1; Am. Compl., ECF No. 27.

In his summary judgment brief, the Plaintiff argues that, based on the applicable statute of limitations period, "the Medical Defendants are liable for their deliberate indifference from February 2020 through February 2022" because the "Plaintiff did not know of his injury (i.e., amputated leg, loss of eyesight, etc.) and its cause until April 2022." Pl. Summ. J. Br. 8, 9, ECF No. 47. The Plaintiff contends that the statute of limitations does not bar evidence of medical care and treatment by the Medical Defendants beginning in February 2020, which occurred more than two years before this lawsuit was filed, from being used to support the Plaintiff's § 1983 claim for deliberate indifference against the Medical Defendants. "Indiana's two-year statute of limitations . . . is applicable to all causes of action brought in Indiana under 42 U.S.C. § 1983." *Snodderly v. R.U.F.F. Drug Enforcement Task Force*, 239 F.3d 892, 894 (7th Cir. 2001). "A § 1983 claim to redress a medical injury arising from deliberate indifference to a prisoner's serious medical needs accrues when the plaintiff knows of his physical injury and its cause." *Devbrow v. Kalu*, 705 F.3d 765, 768 (7th Cir. 2013).

The Plaintiff's assertion of a claim based on poor diabetic control beginning in February 2020 is not well taken because, as argued by the Medical Defendants, the Plaintiff does not acknowledge that in his summary judgment opening brief that this is a new theory of liability not previously alleged. And the Plaintiff filed his Motion for Summary Judgment on April 28, 2025, *see* ECF No. 47, which was approximately three years after the Plaintiff's April 2022 partial left leg amputation injury occurred. Thus, even if the Court interpreted those new factual allegations as a constructive motion to amend the Amended Complaint, a deliberate indifference claim based on the Medical Defendants' alleged poor diabetic control from February 2020 through February 2022 would be barred by the statute of limitations unless those facts relate back the date of the

Plaintiff's original complaint of February 8, 2024, or an exception applies. *See Ollison v. Gossett*, 136 F.4th 729, 740 (7th Cir. 2025) ("[D]istrict courts retain discretion to interpret new factual allegations or claims presented in a plaintiff's briefs as a constructive motion to amend." (quoting *Schmees v. HC1.COM, Inc.*, 77 F.4th 483, 488 (7th Cir. 2023))); Fed. R. Civ. P. 15(c)(1) (establishing when "[a]n amendment to a pleading relates back to the date of the original pleading").

However, the Plaintiff does not argue that a claim based on poor diabetic control from medical care and treatment by the Medical Defendants during February 2020 through February 2022 relates back to the date of the original complaint or that an exception applies, and therefore, the Plaintiff waives any such argument. *See Mahaffey v. Ramos*, 588 F.3d 1142, 1146 (7th Cir. 2009) ("Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived.").

Even if the Plaintiff had raised a "relation back" argument, an amendment to the Amended Complaint would relate back to the date of the original complaint only if "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). Here, the conduct, transaction, or occurrence forming the Plaintiff's theory of the Medical Defendants' deliberate indifference to his serious medical needs in the original complaint began with the Medical Defendants giving the Plaintiff incorrect insulin on February 18, 2022. A claim of poor diabetic control from inadequate medical care from February 2020 through February 17, 2022 does not arise out of that original claim.

Alternatively, district courts retain the discretion to find that a plaintiff has waived allegations not included in the operative complaint as a factual basis for a claim. *See Feazell v. Wexford Health Sources, Inc.*, 140 F.4th 438, 444 (7th Cir. 2025) ("Feazell's sitz bath allegations

20

cannot save his hemorrhoid claim, either. Feazell did not include them in his complaint and the district court did not abuse its discretion when it found he had waived them." (citing *Ollison*, 136 F.4th at 739–41; *Schmees*, 77 F.4th at 488)). Again, in this case, the Plaintiff alleges for the first time—in his summary judgment opening brief—that a factual basis for his deliberate indifference claim is that the Medical Defendants were deliberately indifferent to his poor diabetic control from type I diabetes at the start of his detention in the Allen Country Jail from February 2020 through February 2022, ultimately resulting in his hospitalization from February 28, 2022, through April 25, 2022, and vision loss in his left eye and a partial amputation of his left leg. This reason for his hospitalization, vision loss, and a partial amputation of his left leg is not included in the Plaintiff's Amended Complaint as a factual basis for the Plaintiff's deliberate indifference claim. Thus, the Plaintiff waives the allegations based on a history of poor diabetic control by the Medical Defendants' from February 2020 through February 17, 2022. *See Feazell*, 140 F.4th at 444.

Consequently, the Court does not consider evidence of a claim for deliberate indifference to his serious medical needs by the Medical Defendants based on a history of poor diabetic control before February 18, 2022, as it is barred by the statute of limitations or waived and is not before the Court. The claim for deliberate indifference to serious medical needs before the Court is based on the medical care and treatment by the Medical Defendants from February 18, 2022 to February 28, 2022.

b.      Deliberate Indifference to Serious Medical Needs from February 18, 2022, to February 28, 2022

In the Amended Complaint, the Plaintiff alleges that the Medical Defendants were deliberately indifferent to his serious medical needs from February 18, 2022, to February 28, 2022, resulting in the loss of vision in his left eye and the amputation of his left leg below the knee. The Eighth Amendment prohibits "'deliberate indifference to serious medical needs of

prisoners' amounting to 'the unnecessary and wanton infliction of pain.'" *Stockton*, 44 F.4th at 615 (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021)). To prove a claim of deliberate indifference, the Plaintiff must offer evidence that (1) he suffered an objectively serious medical condition; (2) each defendant in question knew of the condition and was deliberately indifferent to treating him; and (3) this deliberate indifference injured him. *Id.* (citing *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010); *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020)).

On the first element, the parties do not dispute that the Plaintiff's diabetes is an objectively serious medical condition.

Second, to determine if the Medical Defendants acted with deliberate indifference to his diabetes, the Court examines the Medical Defendants' subjective state of mind. *See Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) ("To determine if a prison official acted with deliberate indifference, we look into his or her subjective state of mind." (citation omitted)). To show deliberate indifference, "[the Plaintiff] must provide evidence that [each Medical Defendant] *actually* knew of and disregarded a substantial risk of harm." *Id.* (citation omitted). This standard requires the Plaintiff to show "more than negligence or even gross negligence; [he] must show that [each Medical Defendant] was essentially criminally reckless, that is, ignored a known risk." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 763 (7th Cir. 2021) (citation omitted).

The Plaintiff has five main theories about how the Medical Defendants were deliberately indifferent to his medical needs. Referring to the Medical Defendants as a whole, he contends that the Medical Defendants were deliberately indifferent because they: (1) showed a blatant disregard for medical standards; (2) failed to follow existing protocol; (3) persisted in following a treatment known to be ineffective; (4) chose an easier and less efficacious treatment without

22

exercising professional judgment; and (5) allowed for an inexplicable delay in treatment that served no penological interest. Although the Plaintiff sets forth basic rule statements on deliberate indifference with citations and lists excerpts from the opinions of his two medical experts, Dr. Herrington and Dr. Levin, and facts that he contends establishes the Medical Defendants' deliberate indifference, including for some of the specific Medical Defendants, the Plaintiff does not cite any pertinent case law and does not provide any analysis of how the evidence he cites supports finding an inference of deliberate indifference to his diabetes as to each Medical Defendant in this case. Consequently, any arguments on the potential deliberate indifference of each of the Medical Defendants individually are waived. *See Mahaffey*, 588 F.3d at 1146; *United States v. Holm*, 326 F.3d 872, 877 (7th Cir. 2003) ("It is not the obligation of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel.").

Even so, the Plaintiff does not establish that any of the Medical Defendants were deliberately indifferent to his type I diabetes because he does not explain how any of the evidence that he points to leads to a reasonable inference that each Medical Defendant actually knew of and disregarded a substantial risk of harm related to his diabetes during the relevant time period from February 18, 2022 to February 28, 2022.

As an initial matter, the Plaintiff alleges in the Amended Complaint and asserts in his briefs that the Medical Defendants were deliberately indifferent not only to his diabetes but also to his MRSA. However, the Plaintiff has offered no evidence that any of the Medical Defendants knew that he had MRSA during the relevant time period when they were caring for him. Therefore, the Court denies the Plaintiff's motion for summary judgment on this basis.

Turning to the substantial risk of harm from his diabetes, the Plaintiff does not establish with Dr. Herrington's or Dr. Levin's medical expert opinion that his type I diabetes plainly

23

called for a particular type of treatment because he does not raise any such argument. *See Steele v. Choi*, 82 F.3d 175, 179 (7th Cir. 1996) (explaining that one way to establish deliberate indifference is if a medical expert explains that a plaintiff's "symptoms plainly called for a particular medical treatment—the leg is broken, so it must be set; the person is not breathing, so CPR must be administered," and the treating doctor did not provide the particular medical treatment).

The Plaintiff also does not establish that Dr. Galperin's decision to prescribe 70/30 insulin when the Plaintiff's preferred Lantus insulin ran out "[was] so far afield of accepted professional standards [that it] raise[s] the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). Instead, the Plaintiff pointed to Dr. Herrington's medical expert opinion referring to the Medical Defendants' insulin prescribing practice as "insulin switching" and saying that it "is not consistent with conventional medical practice." ECF No. 46-2, p. 27 of 38. "Although [the Seventh Circuit] [has] recognized that a departure from professional standards that is 'so inadequate that it demonstrated an absence of professional judgment' could support deliberate indifference, [Dr. Herrington's] opinion falls far short of raising such inference." *Johnson v. Dominguez*, 5 F.4th 818, 826 (7th Cir. 2021) (cleaned up). Additionally, the Plaintiff does not show that prescribing 70/30 insulin or any other medication was "an 'easier' treatment course" that was "known to be ineffective." *Id*. Nor does the Plaintiff establish this standard as to Dr. Galperin's treatment of the Plaintiff "not keeping food down" and of his swollen foot with Clindamycin, Tylenol, and Zofran and later Bactrim because neither of the Plaintiff's medical experts offer an opinion about the effectiveness of those treatments. *See Petties*, 836 F.3d at 730 (explaining that one type of evidence that supports an inference of deliberate indifference "is where a prison official persists in a course of treatment known to be ineffective" (citation omitted)).

24

Further, throughout his brief and reply, the Plaintiff identifies various evidence attributed to the Medical Defendants collectively or to specific Medical Defendants. However, none of the evidence establishes that any of the Medical Defendants actually knew of and disregarded a substantial risk for vision loss or an amputation from his diabetes from any of the following during his course of treatment during the relevant time period: a swollen left foot, sores on his foot, foot pain, a foot ulcer, cracked skin on his left foot, heart rate of 109, temperature of 100.2, neuropathy, elevated white blood cell count, infection, sepsis, MRSA, leukocytosis, endocarditis, an acute kidney injury, pneumonia, cellulitis, osteomyelitis, a torn esophagus, vomit, yellow vomit with no visible blood but 3+ when dipped, a small amount of blood in his vomit, gastrointestinal bleeding, not ordering immediate/STAT bloodwork (specifically a complete blood count), not ordering crutches or a wheel chair, insulin switching, poor diabetic control, low blood glucose levels, A1C levels, not treating with oral or IV antibiotics sooner, placement on a suicide watch, the Plaintiff's request for medical care on February 27, 2022, approving the Plaintiff's request for a pumice stone provided by his wife, the Plaintiff's shaving of his foot, or a delay in being transferred to the infirmary, specialist, or hospital.[2] *See Stockton*, 44 F.4th at 615 ("[The plaintiff] must demonstrate each defendant subjectively knew of [his] risk of infective endocarditis and nonetheless disregarded that risk. The defendant must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." (cleaned up)). Without evidence of each Medical Defendant's subjective awareness and disregard of a substantial risk for vision loss or an amputation from his diabetes, the opinions of the medical experts conveying that the Plaintiff's condition required a prompt referral to a specialist, infirmary, or the local hospital "reflects merely a difference of

---

[2] The Plaintiff's additional contention that the actual number of administered units of insulin is not specified in his medical chart is not relevant because a non-party, Dr. Lee, performed the alleged incorrect charting. *See* ECF No. 46-2, p. 26 of 38, ¶¶ 20–22.

opinion over when [the Plaintiff] should have been sent . . . , a scenario that is insufficient to support deliberate indifference." *Murphy v. Wexford Health Sources, Inc.*, 962 F.3d 911, 916 (7th Cir. 2020) (citations omitted).

And the opinions of the Plaintiff's medical experts that the Medical Defendants deviated from the standard of care do not suggest deliberate indifference because neither the medical experts nor the Plaintiff explain how any purported deviation relates to each Medical Defendant's "subjective awareness of a substantial risk" from his diabetes that would lead to vision loss or a partial left leg amputation and the disregard of such risk. *Murphy*, 962 F.3d at 916–17 (explaining that treatment that is "a 'deviation from the standard of care' . . . suggests negligence rather than deliberate indifference"). In fact, neither expert goes so far as to say any medical care by any specific Medical Defendant "demonstrated a 'complete abandonment of medical judgment.'" *Sanders v. Moss*, 153 F.4th 557, 569 (7th Cir. 2025) (quoting *Murphy*, 962 F.3d at 916–17). In the absence of circumstantial evidence showing any individual Medical Defendant "knew better than to make the medical decisions" that he/she did, the potential "evidence of malpractice is not enough for a plaintiff to survive summary judgment [or establish deliberate indifference] on an Eighth Amendment claim." *Petties*, 836 F.3d at 731.

For this reason, the Plaintiff's attempt to characterize Dr. Herrington's reference to "the standard of care" for sepsis as a "protocol" for sepsis is not well-taken. *See* ECF No. 59, p. 15 (citing ECF No. 59-2, p. 35). The Plaintiff is correct in that a doctor's failure "to follow an existing protocol" constitutes circumstantial evidence that a medical doctor's action "reflects sub-minimal competence." *Petties*, 836 F.3d at 729. Nevertheless, in the health care context, a protocol is defined as the "published requirements for health care." *Id*. (quoting *Mata v. Saiz*, 427 F.3d 745, 757 (10th Cir. 2005)). Here, the page in Dr. Herrington's report cited by the Plaintiff does not include any published requirements for the health care of a patient with sepsis.

*See* ECF No. 59-2, p. 35 of 38; *Mata*, 427 F.3d at 756–57 (providing an example of the published requirements for the health care of a patient presenting with chest pains). Instead, without establishing that Defendant Galperin knew the Plaintiff had sepsis, Dr. Herrington only opines that conduct by Defendant Galperin did not meet the standard of care for sepsis. *See Petties*, 836 F.3d at 731 (explaining that evidence of a deviation from the standard of care that may support a malpractice claim is insufficient for establishing deliberate indifference).

As far as receiving insufficient insulin during the relevant time period, it is undisputed that the Plaintiff was not compliant with the insulin administered to him from February 16, 2022, through February 28, 2022, but Dr. Herrington concluded that the insufficient insulin during this brief time period "was not clinically consequential for [the Plaintiff]." ECF No. 46-2, p. 36 of 38. And although the Plaintiff highlights Dr. Herrington's expert medical opinion stating that the Plaintiff had a history of hypoglycemia and high A1C levels that indicate poorly controlled diabetes and Dr. Levin's medical expert opinion stating that the Plaintiff's high A1C levels placed him at an increased risk for infection, they fail to connect the evidence of hypoglycemia and A1C levels to the individual "[Medical Defendants'] treatment [of his diabetes] during the relevant time period." *Johnson*, 5 F.4th at 826.

Under these circumstances, the Court "cannot discern how a jury would be able to determine the effectiveness of the course of treatment provided to [the Plaintiff] without [additional] expert evidence" and without additional explanations/identifications by the Plaintiff with citation to and examples from the pertinent legal authority as set forth above. *Sanders*, 153 F.4th at 568 (citation omitted). Accordingly, the Court denies the Plaintiff's Motion for Partial Summary Judgment on liability because the Plaintiff has not established that there is no genuine dispute of material fact that any of the Medical Defendants were deliberately indifferent to his serious medical needs.

As a result, and because the parties did not brief the issue, the Court need not address the third element of causation. *See Stockton*, 44 F.4th at 615 (explaining that a plaintiff must also establish a "causal link between a defendant's deliberate indifference and [his] injury"). The Court overrules as moot the Medical Defendants' objections to the Plaintiff's evidence. Because the Court makes its ruling based on the evidence and arguments set forth by the Plaintiff, the Court also overrules as moot the Plaintiff's objections to the medical records referenced by the Medical Defendants.

3.      *Eighth Amendment Claim Against Sheriff Hershberger in His Official Capacity for Unconstitutional Conditions of Confinement*

The Plaintiff also moves for summary judgment on his *Monell* claim against Sheriff Hershberger in his official capacity for an Eighth Amendment violation based on unconstitutional conditions of confinement, in which the Plaintiff alleges that he contracted MRSA due to systemic overcrowding and unsanitary conditions at the Allen County Jail. "Section 1983 does not allow vicarious-liability theories against municipalities and higher-level decisionmakers like [Sheriff Hershberger]." *Zemlick v. Burkhart*, 164 F.4th 1004, 1015 (7th Cir. 2026) (citing *Burks v. Raemisch*, 555 F.3d 592, 593 (7th Cir. 2009)). "Instead, such parties may be held accountable for constitutional violations they cause . . . by official policy or custom." *Id.* (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). This means that there is no liability under *Monell* without an underlying constitutional violation. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

The Eighth Amendment prohibits conditions of confinement that deny inmates "the minimal civilized measure of life's necessities." *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008) (citations omitted). In order to recover on his claim for an Eighth Amendment violation based on unconstitutional conditions of confinement, the Plaintiff must show causation, among other elements, in that he must present evidence that the conditions of confinement at the Allen

28

County Jail caused his injury. *See Gray v. Hardy*, 826 F.3d 1000, 1006 (7th Cir. 2016) ("Gray must do more than demonstrate a triable issue of fact with respect to the conditions he faces; he must also show that he suffered some cognizable harm from the overall lack of a sanitary environment . . . ." (citation omitted)); *Dixon v. Godinez*, 114 F.3d 640, 645 (7th Cir. 1997) (finding insufficient evidence of an Eighth Amendment violation when "[the prisoner] . . . offered only conclusory allegations, without backing from medical or scientific sources, that the rank air exposed him to diseases and caused respiratory problems which he would not otherwise have suffered"); *Harris v. County of Cook*, No. 19-CV-4598, 2024 WL 1702678, at *11 (N.D. Ill. Apr. 19, 2024) ("Causation looms large, too. Harris must point to evidence of a cognizable injury based on the conditions of confinement. He cannot rely on his own guesswork to show that inadequate ventilation caused an eye injury. He must present evidence that the conditions of confinement caused the injury."). More broadly, "[i]n order to succeed in a § 1983 suit, [the Plaintiff] must 'establish not only that a state actor violated his constitutional rights, but also that the violation caused the plaintiff injury or damages.'" *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1032 (7th Cir. 2019) (quoting *Roe v. Elyea*, 631 F.3d 843, 864 (7th Cir. 2011)).

Here, the Plaintiff asserts that "during his incarceration at the Allen County Jail, the jail was overcrowded and plagued with unsanitary conditions, which contributed to health issues, including the poor management of his diabetes and his contraction of MRSA." Pl. Br. 22, ECF No. 47. He also asserts that "the unconstitutional conditions were the moving force for his damages, which include the amputation of his left leg below the knee and loss of eyesight and the emotional distress he suffered therefrom." *Id*. In support, the Plaintiff shows that he was first housed at the Allen County Jail in February 2020, and he was not diagnosed with MRSA until he was admitted to the hospital in early March 2022. He argues that "[g]iven that [he] did not suffer

from a MRSA infection [in] 2020, the only reasonable inference is that he contracted the infection while at the Allen County Jail." *Id.*

Although it is true that the Plaintiff was housed at the Allen Country Jail from February 2020 through February 28, 2022, he was not there continuously because he underwent cataract surgery on January 12, 2022, and had follow-up visits on January 14, 2022, and February 4, 2022, as highlighted by Defendant Hershberger. And the Plaintiff was not diagnosed with a MRSA infection until after he had been admitted to Parkview Hospital on March 3, 2022. The Plaintiff's speculation that he contracted MRSA at the Allen County Jail is insufficient. *See Herzog v. Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014) ("[I]nferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." (citation omitted)). Instead, he needs to show that the specific overcrowding and unsanitary conditions that he was exposed to at the Allen County Jail caused his MRSA infection, and the MRSA infection caused the injuries for which he seeks damages—the partial left leg amputation below the knee and the loss of vision in his left eye.

The Plaintiff states that the Allen County Jail housed him in a cell with three total individuals that was designed for only two individuals, yet he provides no evidence that he acquired his MRSA infection from a cell mate. The Plaintiff also states that: (1) he had an unclean cell, dayroom, and showers; (2) the showers at the Allen County Jail constantly backed up with sewer water; and (3) he was exposed to wastewater from the toilet due to a burst pipe between his cell and an adjoining cell. However, the Plaintiff produces no evidence that MRSA was present in any of these locations during the relevant time period let alone medical evidence establishing that his particular MRSA infection originated from any of these sources. The Plaintiff merely speculates that the overcrowding and unsanitary conditions at the Allen County Jail caused him to contract MRSA, but he does not show how, when, or where he contracted his

30

MRSA infection or that MRSA caused his injuries of the amputation of his leg below the left knee and the loss of vision in his left eye.

The only medical evidence in the record that the Plaintiff points to is the Plaintiff's hospital record that says MRSA grew in a blood culture and he was diagnosed with MRSA and sepsis during his February 28, 2022, to April 25, 2022 hospital stay; Dr. Levin's expert medical opinion that "[i]t is known that infections spread quickly in diabetics" and "Dr. Galperin and other Quality Correctional Care employees asked [the Plaintiff's] wife to bring a pumice stone and he and his infection were exposed to the elements of the dirty jail," ECF No 46-6, ¶¶ 11, 13; and Dr. Herrington's expert medical opinion that poor diabetic control caused the need for the Plaintiff's amputation, which was based on the Plaintiff's hospital record that stated the amputation was because of poor diabetic control, microvascular disease, and the Plaintiff's incarceration status. Even still, the Plaintiff does not point to any medical expert opinion on when, where, or how he contracted MRSA.

Also insufficient is the Plaintiff's lawyer's argument that "[a]lthough Plaintiff's left leg was amputated because of Medical Defendants' poor management of Plaintiff's diabetes, the sepsis from the MRSA infection was the catalyst for the amputation." ECF No. 47, p. 25. Without such a statement by a qualified expert, there is no basis for establishing that MRSA caused the need for the Plaintiff's amputation. *See United States v. Cravens*, 275 F.3d 637, 640 (7th Cir. 2001) ("[T]he *causation* of a mental disease or defect is a more technical medical determination such that a court would find expert testimony particularly useful to its ultimate decision."); *Goffman v. Gross*, 59 F.3d 668, 672 (7th Cir. 1995) ("But the medical effects of secondhand smoke are not within the ken of the ordinary person, so these inmates' lay testimony by itself cannot establish the showing of medical causation necessary to sustain Goffman's claim." (citation omitted)); *Wade v. Lain*, No. 2:11-CV-454, 2015 WL 6828851, at *6 (N.D. Ind.

Nov. 6, 2015) ("Generally, medical causation requires expert testimony." (citation omitted));

*McGown v. Arnold*, No. 1:13-CV-148, 2014 WL 5502612, at \*6 (N.D. Ind. Oct. 30, 2014)

("Matters of causation generally necessitate expert testimony." (citing *Cyrus v. Town of*

*Mukwonago*, 624 F.3d 856, 863–64 (7th Cir. 2010); *Christmas v. City of Chicago*, 691 F. Supp.

2d 811, 821 (N.D. Ill. 2010))).

Contrary to the Plaintiff's assertion, the instant case is distinct from *Cyrus* because here

"the general rule . . . that expert testimony is not necessary to prove causation if all the primary

facts can be accurately and intelligibly described to the jury . . . ." is inapplicable, as "correct

conclusions" of the source of the Plaintiff's MRSA infection and that MRSA was the cause of

his need for the amputation and loss of vision cannot be drawn from "common understanding"

and "comprehending the primary facts." *Cyrus*, 624 F.3d at 864 (cleaned up). Although it is

undisputed that the Plaintiff was diagnosed with MRSA before his partial left leg amputation and

vision loss, there is no evidence that the MRSA infection caused the need for the Plaintiff's

amputation and caused his vision loss or that unconstitutional conditions of confinement at the

Allen County Jail caused the MRSA infection. The Plaintiff's own medical expert Dr.

Herrington opined that it was poor diabetic control that caused the need for the Plaintiff's

amputation, and the Plaintiff's hospital record states poor diabetic control, microvascular disease,

and incarceration status were the reasons for the amputation. Also, again, there is no non-

speculative evidence of how, when, and where the Plaintiff contracted MRSA. And the Plaintiff

does not point to any medical opinion on the cause of the Plaintiff's vision loss in his left eye.

Accordingly, the Court finds that the Plaintiff has not pointed to evidence to establish that

there is no genuine dispute of material fact that unconstitutional conditions of the Allen County

Jail caused his MRSA infection or that MRSA caused the need for the amputation below his left

knee or the loss of vision in his left eye. Thus, the Court need not address the parties' additional

arguments on the Plaintiff's claim against Defendant Hershberger. As a result, the Court denies the Plaintiff's Motion for Summary Judgment as to the Plaintiff's *Monell* claim against Defendant Hershberger based on an underlying Eighth Amendment violation for unconstitutional conditions of confinement at the Allen County Jail.

Because the Plaintiff does not have non-speculative evidence that establishes the specific source of the Plaintiff's MRSA infection and that MRSA caused the Plaintiff's need for the amputation and loss of vision, it appears that summary judgment should be entered in favor of Defendant Hershberger and against the Plaintiff. "A district judge is authorized to grant summary judgment to a party that has not requested it; [she] is not required to conduct a trial when there is no genuine issue of material fact, just because the parties [did not] notice the absence of any triable issues." *Hunger v. Leininger*, 15 F.3d 664, 669 (7th Cir. 1994) (citation omitted). "However, 'granting summary judgment sua sponte warrants special caution' and generally requires that the party against whom summary judgment is entered have notice and an opportunity to present its evidence." *Golden Years Homestead, Inc. v. Buckland*, 557 F.3d 457, 462 (7th Cir. 2009) (citation omitted). Here, the Court cannot consider the absence of the Plaintiff's evidence on causation to grant summary judgment in favor of Defendant Hershberger and against the Plaintiff on the Plaintiff's *Monell* claim based on an underlying Eighth Amendment violation without giving the Plaintiff a reasonable opportunity to respond.

Based on the foregoing, the Court will set a deadline for the Plaintiff to file a summary judgment response brief addressing why summary judgment should not be granted for Defendant Hershberger on the *Monell* claim based on an underlying Eighth Amendment violation from unconstitutional conditions of confinement at the Allen County Jail. The Court will also set a deadline for Defendant Hershberger to file a reply, if any, in support of summary judgment on

the claim. In the alternative, the Plaintiff may file a motion to voluntarily dismiss his claim against Defendant Hershberger.

4.      *Medical Malpractice Claim Under Indiana State Law*

The Plaintiff also moves for summary judgment on his claim against the Medical Defendants for medical malpractice under Indiana state law. However, the Court denies without prejudice the motion on this claim to be reinstated if the remaining federal claim—the § 1983 *Monell* claim against Defendant Hershberger based on an underlying Eighth Amendment violation for unconstitutional conditions of confinement—survives summary judgment. It is the Court's practice to relinquish jurisdiction over state law claims when there are no remaining federal claims. *See* 28 U.S.C. § 1367(c)(3).

**B.      Medical Defendants' Motion for Summary Judgment**

The Medical Defendants move for summary judgment on the Plaintiff's § 1983 Eighth Amendment claim and medical malpractice claim under Indiana state law against them.

1.      *Eighth Amendment Claim*

As set forth above, an Eighth Amendment claim of deliberate indifference requires a plaintiff to prove that (1) he suffered an objectively serious medical condition; (2) each defendant in question knew of the condition and was deliberately indifferent to treating him; and (3) this deliberate indifference injured him. *Stockton*, 44 F.4th at 615 (citations omitted). The Medical Defendants move for summary judgment on the claim, arguing that the Plaintiff has not raised a genuine dispute of material fact that any individual Medical Defendant was deliberately indifferent to treating him.

In response, the Plaintiff largely raises the same arguments and points to the same evidence on the claim offered in support of his Motion for Partial Summary Judgment, which the Court denied above. *Compare* ECF Nos. 37, 64, *with* ECF No. 59. However, in his response to

34

the Medical Defendants' Motion for Summary Judgment, the Plaintiff also attaches three additional affidavits, one each by medical experts Dr. Herrington and Dr. Levin and one by the Plaintiff. *See* ECF Nos. 59-7, 59-8, 59-9. Nevertheless, in his response brief, the Plaintiff does not explain how any additional information in the new affidavits creates a genuine dispute of material fact as to each Medical Defendant's subjective awareness and disregard of a substantial risk of vision loss or a partial left leg amputation. *See Murphy*, 962 F.3d at 916.

Instead, the Plaintiff argues generally:

> In any case, for the purpose of ruling on Medical Defendants' Motion for Summary Judgment, the Court must draw all inferences and resolve all doubts in Plaintiff's favor. A factfinder could easily infer from the designated evidence that Medical Defendants acted against their professional judgment regarding Plaintiff's consistently high A1C levels and growing issues with his vision and foot. A factfinder could easily infer that Medical Defendants simply disregarding Plaintiff's symptoms by the fact that according to Dr. Herrington their care of Plaintiff's diabetes and worsening foot condition was marked by "multiple extreme departures from [the] standard of care." 46-2 at p. 13, ¶¶ 18–20. This would amount to deliberate indifference to a serious medical need.

ECF No. 59, pp. 22–23. However, the Plaintiff still does not explain how any of the evidence leads to a reasonable inference that each Medical Defendant actually knew of and disregarded a substantial risk from his diabetes for a loss of vision or a partial left leg amputation.

Although Dr. Galperin noted the Plaintiff's A1C levels, he described the Plaintiff's diabetic control as "Fair" and "Good." ECF No. 46-3, pp. 29, 31, 34 of 54. And the Plaintiff does not point to evidence in the record with an explanation about how such A1C levels establish a substantial risk for vision loss or a partial left leg amputation that Dr. Galperin or any other individual Medical Defendant was aware of and disregarded. Neither expert goes so far as to explain how the Plaintiff's A1C levels demonstrated an obvious risk for vision loss or a partial amputation of the left leg.

Even if they had, the Plaintiff also does not connect this evidence to Dr. Galperin's "treatment [of the Plaintiff] during the relevant time period" with antibiotics, first with

35

Clindamycin and then with Bactrim, and with insulin. *See Johnson*, 5 F.4th at 826 ("While at the time of his deposition Johnson reported his hernia pain to be as high as a twelve to fifteen on a ten-point scale, he failed to connect this evidence to defendants' treatment during the relevant time period."). Neither medical expert opines on these treatments to say what symptoms they address or why they were ineffective against the Plaintiff's symptoms; they only say that "insulin switching" is unconventional and the Plaintiff should have been treated with antibiotics "much earlier." Without a medical expert's opinion on the effectiveness of the treatments Dr. Galperin prescribed for the Plaintiff during the relevant time period, any comments by the medical experts about the degree of departure the Plaintiff's medical care was from the standard of care is irrelevant because the factfinder is not able to assess how "far afield of accepted professional standards" the treatment with antibiotics and insulin was. *Norfleet*, 439 F.3d at 396. And even if the Plaintiff had established that Dr. Galperin's treatment of the Plaintiff with insulin during the relevant time period "raise[s] the inference that it was not actually based on a medical judgment," and it does not, the Plaintiff's own medical expert Dr. Herrington opined that it was not clinically consequential for the Plaintiff; and, thus, there is no possible inference that it placed the Plaintiff at a substantial risk for loss of vision or amputation or any other substantial risk from his diabetes. *See id.*

Also, as set forth in Section A(2)(b) above, the Plaintiff has not offered any evidence that the Medical Defendants knew he had MRSA during the relevant time period when they were caring for him. Thus, he has not created a genuine dispute of material fact to support his deliberate indifference claim based on the serious condition of MRSA.

Because the Plaintiff has not established a genuine dispute of material fact as to any of the individual Medical Defendants' deliberate indifference to the Plaintiff's serious medical needs, as explained here and in Section A(2)(b) above, the Court grants the Medical Defendants'

36

Motion for Summary Judgment as to the Eighth Amendment deliberate indifference claim against them.

2.      *Indiana State Law Medical Malpractice Claim*

The Medical Defendants also move for summary judgment on the Plaintiff's claim for medical malpractice under Indiana state law. As highlighted by the Plaintiff in response, the Medical Defendants' sole briefing of this issue consists of the following statements:

> [The Plaintiff's] state law claims against both QCC and the individual Medical Defendants violate one of the most basic principles of tort law – the doctrine of *respondeat superior*. All parties agree that the individual Medical Defendants were all acting within the course and scope of their employment with QCC. Therefore, the individual Medical Defendants have no individual or personnel[sic] liability for [the Plaintiff's] state law claims.
>
> Thus, [the Plaintiff's] state law claims against the individual Medical Defendants should be dismissed and all state law claims against QCC remanded to state court.

ECF No. 53, p. 18. Because the Medical Defendants do not develop their argument with citation to any pertinent legal authority, they waive any such argument. *See Mahaffey*, 588 F.3d at 1146. Thus, the Court denies the Medical Defendants' Motion for Summary Judgment as to the Plaintiff's medical malpractice claim under Indiana state law.

**C.      Abandoned Federal Claims Against Defendants QCC, Studebaker, and Gilbert**

Although the Medical Defendants' motion for summary judgment on the Plaintiff's § 1983 Eighth Amendment claims against Defendants QCC, Studebaker, and Gilbert for deliberate indifference to the Plaintiff's serious medical needs is granted based on the analysis above, the Court finds that summary judgment is also appropriate because the claims are abandoned. In his summary judgment response, the Plaintiff does not address the Medical Defendants' arguments or defend these individual claims in any way except to say that he is not pursuing such a *Monell* claim against Defendant QCC; thus, he has abandoned his federal claims against Defendants QCC, Studebaker, and Gilbert. *See Palmer v. Marion County*, 327 F.3d 588,

37

597 (7th Cir. 2003) (concluding that a claim was abandoned when a party failed to defend it "in

his district court brief in opposition to summary judgment"). Therefore, Defendants QCC,

Studebaker, and Gilbert are entitled to judgment on the Plaintiff's § 1983 deliberate indifference

claim on this additional basis.

**CONCLUSION**

Based on the foregoing, the Court hereby:

(1) For the Plaintiff's Motion for Partial Summary Judgment [ECF No. 46], the Court DENIES the motion as to the Plaintiff's Eighth Amendment claim against the Medical Defendants for deliberate indifference to the Plaintiff's serious medical needs (Count I) and as to the Plaintiff's *Monell* claim against Defendant Hershberger based on an underlying Eighth Amendment violation for unconstitutional conditions of confinement at the Allen County Jail (Count II), and DENIES without prejudice the motion as to the medical malpractice claim under Indiana state law (Count III) to be reinstated if the federal claim against Defendant Hershberger remains following further summary judgment briefing on that claim as set forth below;

(2) ORDERS the Plaintiff to FILE by **April 13, 2026**, a summary judgment response brief addressing why summary judgment should not be granted for Defendant Hershberger in his official capacity on the *Monell* claim based on an underlying Eighth Amendment violation for unconstitutional conditions of confinement at the Allen County Jail in light of the Plaintiff not offering evidence on the source of the MRSA infection or that MRSA was the cause of his need for an amputation and vision loss (Count II) and ORDERS that the deadline for Defendant Hershberger to file a reply, if any, in support of summary judgment on this claim is **April 27, 2026**; in the alternative, by April 8, 2026, the Plaintiff may file a motion to voluntarily dismiss his *Monell* claim against Defendant Hershberger based on an underlying Eighth Amendment violation for unconstitutional conditions of confinement (Count II);

(3) GRANTS the Medical Defendants' Motion to File Belated Brief, Statement of Undisputed Facts, and Designation of Evidence in Support of Motion for Summary Judgment [ECF No. 52]; and

(4) GRANTS in part and DENIES in part the Medical Defendants' Motion for Summary Judgment [ECF No. 49]. The Court grants the motion as to the § 1983 Eighth Amendment claim for deliberate indifference to the Plaintiff's serious medical needs against the Medical Defendants (Count I). The Court denies the motion as to the medical malpractice claim under Indiana state law against the Medical Defendants (Count III).

The case remains pending as to the Plaintiff's § 1983 Eighth Amendment *Monell* claim

against Defendant Sheriff Troy Hershberger in his official capacity and the Plaintiff's Indiana

state law medical malpractice claims against Defendants Quality Correctional Care, LLC, Nurse

Tessa Lehman, Nurse Jeanie Herman, Nurse Jacqueline Ryan, Nurse Kelly Studebaker, Nurse

Janie Gilbert, and Mikhail Galperin MD.

       SO ORDERED on March 20, 2026.

                    s/ Theresa L. Springmann
                    JUDGE THERESA L. SPRINGMANN
                    UNITED STATES DISTRICT COURT